02-10-464-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-10-00464-CR

 

 


 
 
 Jose Angel Sarmiento
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 The State of Texas
 
 
  
 
 
 STATE
 
 


 

 

----------

FROM THE 271st
District Court OF Wise COUNTY

----------

MEMORANDUM
OPINION[1]

----------

I.  Introduction

          In
two points, Appellant Jose Angel Sarmiento appeals his convictions for capital
murder and attempted capital murder.  We will affirm.

II.  Background

          Sarmiento
entered Bettie Walker’s residence early in the morning on December 18,
2005, and shot her; Lydia Walker, Bettie’s granddaughter; and Jessica Corsbie,
Lydia’s friend.  Bettie died from complications caused by a gunshot wound to
her chest, but Lydia and Jessica, who were each shot in the leg, survived.  Police
questioned Sarmiento immediately after the shootings but released him.  When authorities
obtained a warrant for Sarmiento’s arrest, they learned that he had gone to
Mexico, where he remained until he returned to the United States and was
arrested in May 2009.  Sarmiento confessed to investigators that he shot Bettie,
Lydia, and Jessica.  The trial court automatically sentenced Sarmiento to life
imprisonment upon his conviction for capital murder, and the jury assessed his punishment
at life imprisonment for the attempted capital murder conviction.

III.  Invocation
of Right to Counsel

          In
his first point, Sarmiento argues that the trial court erred by admitting incriminating
physical evidence that police obtained as a result of statements that Sarmiento
made after he clearly invoked his right to counsel during custodial
interrogation.  Sarmiento also appears to contend that the trial court erred by
allowing the State to question an investigator about statements that Sarmiento
made during the interview but after he invoked his right to counsel.

          When
a suspect asks for a lawyer, interrogation must cease until counsel has been
provided or the suspect initiates further communication with the police.  Edwards
v. Arizona, 451 U.S. 477, 484–85, 101 S. Ct. 1880, 1885 (1981).  But
not every mention of a lawyer will invoke the right to the presence of counsel
during questioning; the suspect must unambiguously request counsel.  Davis
v. United States, 512 U.S. 452, 459, 114 S. Ct. 2350, 2355 (1994); State
v. Gobert, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009).  The test is
objective:  did the suspect sufficiently clearly articulate his
desire to have counsel present such that a reasonable police officer in the
circumstances would understand the statement to be a request for an attorney.  Davis
v. State, 313 S.W.3d 317, 339 (Tex. Crim. App. 2010), cert. denied,
132 S. Ct. 122 (2011).  When reviewing alleged invocations of the right to
counsel, we look to the totality of the circumstances surrounding the
interrogation, as well as the alleged invocation, to determine whether a
suspect’s statement can be construed as an actual invocation of his right to
counsel.  Dinkins v. State, 894 S.W.2d 330, 351 (Tex. Crim. App. 1995).

          The
record demonstrates that investigators located Sarmiento soon after the shootings
occurred, transported him to the police department, and questioned him regarding
his whereabouts that night.  Investigators read Sarmiento his Miranda
rights, and Sarmiento signed a card waiving those rights.  During the questioning,
Sarmiento consented to a search of his residence, and authorities later found a
hooded sweatshirt that he had worn earlier in the night and that matched Lydia
Walker’s description of the clothing worn by the person responsible for the
shootings.  At trial, Texas Ranger Dwayne Dockery testified about an exchange
that he had with Sarmiento during the interview regarding Sarmiento’s
mentioning an attorney:

          Q.      Now,
he did mention an attorney at one point, did he not?

 

          A.      Yes,
sir.

          Q.      Tell
the jury what he said.

          A.      Well,
at one point during the questioning, I asked the Defendant about obtaining a
GSR test on him, which is a gunshot residue test.

 

                    And
at that point he said that he might need to talk to an attorney before he did
that.

 

          Q.      All
right.  Specifically, that test?

          A.      Yes,
sir.

          Q.      Now,
did you -- did you really want a gunshot residue sample from him?

 

          A.      No,
sir.

          Q.      So
why did you talk to him about it?

          A.      I
wanted to see what his response was going to be.

          Q.      And
why . . . were you not really . . . interested . . . in
doing that test at that point?

 

          A.      Because
I knew, based on my experience and training, that due to the amount of time
that had lapsed since this offense had occurred, that we would not be able to
get any results from that 

GS -- gunshot
residue test.

 

          Q.      All
right.  So you just wanted to see how he reacted to it?

 

          A.      Yes,
sir.

          Q.      And
his response to you was, well, maybe I should talk to a lawyer before I do
that?

 

          A.      Correct.[2]

          Sarmiento’s statement that
he “might” need to talk to an attorney or that he “maybe” should talk to a
lawyer was not a clear and unambiguous request for counsel requiring the investigators’
questioning to terminate.  See Davis, 512 U.S. at 462, 114 S. Ct.
at 2357 (holding that petitioner’s remark—“Maybe I should talk to a lawyer”—was
not a request for counsel); Dinkins, 894 S.W.2d at 351–52 (holding that
appellant’s statement—“Maybe I should talk to someone”—was not an invocation of
right to counsel).  At most, it was an ambiguous statement that he might want
to speak to an attorney.  The trial court did not err by permitting the State
to question Ranger Dockery about Sarmiento’s statements made throughout the
entire interview on December 18, 2005.

          Even
if Sarmiento’s statement could somehow be construed as an unambiguous request
for counsel, (1) the State did not seek to admit the hooded sweatshirt,
and nonetheless, (2) physical evidence discovered as a result of a
statement made in violation of Miranda, or “fruit of the poisonous
tree,” must only be suppressed if the statement was made through actual police
coercion.  See Baker v. State, 956 S.W.2d 19, 22 (Tex. Crim. App.
1997) (“We have held that where evidence obtained as a result of an
interrogation has not been used, the appellate court need not entertain a
complaint attacking admissibility of that evidence.”); id. at 22–23 (“We
hold that the Tucker/Elstad rule applies to the failure to scrupulously
honor the invocation of Miranda rights.  In the absence of actual
coercion, the fruits of a statement taken in violation of Miranda need
not be suppressed under the ‘fruits’ doctrine of Wong Sun.”); see
also In re H.V., 252 S.W.3d 319, 327–29 (Tex. 2008) (explaining same). 
Sarmiento does not argue that he was coerced during the December 18, 2005 interview
with investigators.  Accordingly, we overrule Sarmiento’s first point.

IV.  Jury Instruction

          In
his second point, Sarmiento argues that the trial court erred by failing to give
an article 38.23(a) “specific” voluntariness instruction addressing statements
made by Texas Ranger James Holland, “[i]nasmuch as [they] . . . might
have been construed as bearing on [Sarmiento’s] voluntariness to return to the
United States, or to provide a statement to Ranger Holland after he arrived.”

          In
our review of a jury charge, we first determine whether error occurred; if
error did not occur, our analysis ends.  See Abdnor v. State, 871 S.W.2d
726, 731–32 (Tex. Crim. App. 1994); see also Sakil v. State, 287 S.W.3d
23, 25–26 (Tex. Crim. App. 2009).

          In
Oursbourn v. State, the court of criminal appeals thoroughly addressed
the issue of jury instructions relevant to the voluntariness of a defendant’s
confession.  259 S.W.3d 159, 169–79 (Tex. Crim. App. 2008).  The court
explained that there are three types of instructions under Texas statutory law
that relate to the taking of confessions:  (1) a
“general” article 38.22, section 6 voluntariness instruction; (2) a
“general” article 38.22, section 7 warnings instruction (referring to the warnings
under article 38.22, sections 2 and 3); and (3) a “specific” article
38.23(a) exclusionary-rule instruction.  Id. at 173; see Tex.
Code Crim. Proc. Ann. art. 38.22, §§ 2, 3, 6 & 7, art. 38.23(a) (West
2005).  Due process and Miranda claims—involving police overreaching and
coercion—may warrant both “general” and “specific” voluntariness instructions,
while Texas statutory involuntariness claims—which may implicate the
defendant’s state of mind—warrant only a “general” voluntariness instruction.  Oursbourn,
259 S.W.3d at 174.  A “specific” exclusionary-rule instruction concerning the
making of a confession is warranted only when police activity involves
inherently coercive practices like those set out in Colorado v. Connelly,
479 U.S. 157, 163 & n.1, 107 S. Ct. 515, 520 & n.1 (1986).[3] 
Oursbourn, 259 S.W.3d at 178.  There are, however, three requirements to
trigger an article 38.23(a) instruction:  (1) the evidence heard
by the jury must raise an issue of fact, (2) the evidence of fact must be
affirmatively contested, and (3) the contested factual issue must be
material to the lawfulness of the challenged conduct in obtaining the statement
claimed to be involuntary.  Id. at 177.  “This factual dispute can be
raised only by affirmative evidence, not by mere cross-examination questions or
argument.”  Id.

          The
trial court gave the jury a combined “general” article 38.22, section 6
and section 7 voluntariness instruction, which Sarmiento does not
challenge, and stated as follows:

          The
court has admitted into evidence before you the alleged oral statement of the
defendant, and you are instructed that before you may consider the same for any
purpose you must first believe from the evidence beyond a reasonable doubt that
the same was freely and voluntarily made by the defendant without compulsion or
persuasion and that prior thereto the defendant had been warned by the person
to whom the statement was made that:

 

(1)  he
had the right to remain silent and not make any statement at all and that any
statement he made may be used against him at trial; and

 

(2)  any statement he
made may be used as evidence against him in court; and

 

(3)  he had the right
to have a lawyer present to advise him prior to and during any questioning; and

 

(4)  if he was unable
to employ a lawyer, he had the right to have a lawyer appointed to advise him
prior to and during any questioning; and

 

(5)  he had the right
to terminate the interview at any time;

 

and that the
defendant prior to and during the making of the statement, knowingly,
intelligently and voluntarily waived these rights; but if you do not so
believe, or if you have a reasonable doubt thereof, then the alleged statement
is entirely withdrawn from your consideration and you shall not give the same any
force or effect whatever or consider it as any evidence of the defendant’s
guilt in this case, and you shall not consider any evidence obtained as a
result thereof, if any.

But
the trial court denied Sarmiento’s requested “specific” article 38.23(a) instruction,
which he set out as follows:

You
are instructed that under our law a confession or statement of a defendant is
to be considered as valid evidence only if it appears that the same was freely
and voluntarily made without compulsion, coercion or persuasion.  So, if you
find from the evidence in this case or if you have a reasonable doubt that
prior to the giving of the statement by the defendant, if he did give one, any
officer threatened to cause the Defendant’s family to be harm[ed] or in any
manner coerced the defendant or used any improper influence on the defendant,
and the defendant, through fear or under duress or under any other improper
influence was hereby induced to give or sign said statement, then such
statement would not be freely made and voluntary, and in such case, you will
wholly disregard the alleged confession or statement and not consider it for
any purpose.  Additionally, you will disregard and not consider for a[n]y
purpose any evidence obtained directly or indirectly as a result of the
involuntary statement or confession.  [Emphasis added.]

Sarmiento
states that this requested instruction “pointed to the facts in the trial that
might have been found coercive by the jury.”  He contends,

          Ranger
Holland admitted that he [appealed] to Appellant’s emotions to get him to
talk.  Holland told Appellant on the telephone that there was a reward for his
arrest while Appellant was in Mexico, that there were bounty hunters, and the
Ranger had no control over those people.  Ranger Holland told Appellant’s
family similar things in order to get Appellant to come back to the United
States.  [Record references omitted.]

          Ranger
Dockery testified that he turned his investigation over to Texas Ranger James
Holland in 2008.  Ranger Holland testified that his primary goal was to locate
Sarmiento, interview him, and bring him back to the United States.  For over a
year and a half, Ranger Holland “tried multiple approaches to bring” Sarmiento
back to the United States, including running Crime Stoppers advertisements and
contacting multiple government agencies.  At some point, Ranger Holland made
contact with Sarmiento’s sister, who gave him a phone number to contact
Sarmiento.  Ranger Holland called the phone number and spoke to Sarmiento. 
Over the course of several conversations, Ranger Holland told Sarmiento that
there were warrants out for his arrest, that he would be arrested once he entered
the United States, and that he needed to return to the United States if he
wanted to prove his innocence.  Ranger Holland testified that as a trained
interrogator, he employs different approaches when working with suspects and
that in this case, “Sarmiento wanted to be coddled.  And I stepped into that
role as the caregiver; the mother, the father he never had; who was there to
listen to him.  You know, he was done wrong, and I needed to help him, and
that’s the role that I stepped into.”  Regarding rewards that had been offered
for Sarmiento’s return, Ranger Holland testified,

I told him that there
[were] rewards out for him.  And that I had absolutely no control over Mexican
authorities, over anyone who would answer these rewards in the paper; bounty
hunters, road police officers, you know, federales.  I had no control over who
came after him and when they came after him.

 

          And I did
tell him that, you know, the only concrete piece of information that we have
about him is location, where his mother lives.  And I said, you know, you
really need to think about your family, and think about your mom, because these
people are going to go [to] your mother.  And they’re going to, you know, set
up surveillance.  And they’re going to pick her up time and time again until
they locate you.

The
following exchange then occurred on cross-examination:

          Q.      Okay. 
I’m just curious as to how you were able to convince [him] to -- to
come back and walk across the bridge, so you could put him in jail?

 

                    What
did you say to him?

 

          A.      Multiple
conversations, but I don’t know --

 

                    Like
I said before, I don’t really know that there was so much convincing going on. 
I think that he honestly wanted to come over here.

 

                    I
was surprised.

 

          Q.      Did
he tell you that he was concerned about the safety of his family?

 

                   A.      Yes;
he did.

          Q.      And
did you say anything to him to make him be concerned about his family?

 

          A.      Did
I say I was going to threaten his family?

 

                    No.

 

          Q.      No.

 

          A.      Did
I say that I had control of people that would be looking for him in Mexico?

 

          Q.      Yeah.

 

          A.      I
told him I had no control with anyone who worked in Mexico, the Mexican
authorities, or any agents of the Mexican government.

 

          Q.      Did
you tell him that there was -- there either was a reward, or there
was going to be a reward put up for his return dead or alive?

 

          A.      No.

 

                    He -- He
was told, and I’m sure that he was aware that there was a reward for his
arrest.

 

                    Did
I ever make the statement that it was dead or alive reward; no, I didn’t.

 

          Q.      Did
you tell him that you wouldn’t be a bit surprised if the drug cartel down
there, or some of their operatives might injure or kill his child and wife
while they were looking for him?

 

          A.      No;
I didn’t say that.

 

                    There
[were] comments made about who would be a bounty hunter, and who would look for
him in situations like that.  And he was -- it was described to him
that I had no control of those people.  And that there . . . was
a monetary reward for his arrest.

 

          Q.      Did
you --

 

                    You
did make those comments, though, to him?

 

          A.      Exactly.

 

          Q.      You
told him that you didn’t have any control, and his family might get hurt if he
didn’t come back?

 

          A.      I
made the comment that I had no control over the world that was out there.  And
I had no control over the people who may or may not locate him.

 

          Q.      But
you don’t see that as any type of coercion on the Defendant to come up there
and say what you wanted him to say?

 

          A.      There’s
a reward for his arrest?

 

          Q.      No;
I’m talking about the fact his wife and child might be killed or hurt.

 

          A.      I didn’t
tell him that his wife and child may be killed or hurt.

 

                    Could
he have come to that conclusion on his own?

 

                    Yes.

 

                    Would
that have been a legitimate conclusion?

 

                    Mexico
is a rough place; it could have been.

 

          Q.      The
statements you made, was that your purpose for him to come to that conclusion?

 

          A.      My
purpose was for him to come back to the United States of his own free will.

          The
only witness who testified on behalf of Sarmiento was his sister.  She
testified that Ranger Holland told her that there would be a reward for
Sarmiento if he did not return to the United States, that the cartels in Mexico
were “really bad right now,” and that she was concerned for Sarmiento’s safety
because the cartels would “kill whoever they have to kill to get the money.”

          The
record does not demonstrate that Ranger Holland implemented the type of
coercive police tactics referenced in Connelly as part of his attempts
to convince Sarmiento to return to the United States or to give a statement
admitting guilt.  There is no fact issue, and indeed no evidence, that Ranger
Holland—or someone at his insistence—threatened Sarmiento in any way. 
Accordingly, we hold that the trial court did not err by denying Sarmiento’s
requested article 38.23(a) “specific” voluntariness instruction.  We overrule
Sarmiento’s second point.

V.  Conclusion

          Having
overruled both of Sarmiento’s points, we affirm the trial court’s judgments.

 

 

BILL MEIER
JUSTICE

 

PANEL:  GARDNER, MCCOY, and MEIER, JJ.

 

DO NOT PUBLISH

Tex. R. App.
P. 47.2(b)

 

DELIVERED: 
May 3, 2012









[1]See Tex. R. App. P. 47.4.





[2]Sarmiento does not
challenge Ranger Dockery’s recollection of the conversation.





[3]The Court referenced the
following as inherently coercive practices:  “defendant subjected to 4-hour
interrogation while incapacitated and sedated in intensive-care unit”;
“defendant, on medication, interrogated for over 18 hours without food or
sleep”; “police officers held gun to the head of wounded confessant to extract
confession”; “16 days of incommunicado interrogation in closed cell without
windows, limited food, and coercive tactics.”  Connelly, 479 U.S. at 163
n.1, 107 S. Ct. at 520 n.1.